Opinion by Judge MILAN D. SMITH, JR.; Dissent by Judge BYBEE.
M. SMITH, Circuit Judge:
Defendant-Appellant Xavier Alvarez conditionally pleaded guilty to one count of falsely verbally claiming to have received the Congressional Medal of Honor, in violation of the Stolen Valor Act (the Act), 18 U.S.C. § 704(b), (c),[1] reserving his right to appeal the Act’s constitutionality.
*1200 The Act, as presently drafted, applies to pure speech; it imposes a criminal penalty of np to a year of imprisonment, plus a fíne, for the mere utterance or writing of what is, or may be perceived as, a false statement of fact—without anything more.
The Act therefore concerns us because of its potential for setting a precedent whereby the government may proscribe speech solely because it is a lie. While we agree with the dissent that most knowingly false factual speech is unworthy of constitutional protection and that, accordingly, many lies may be made the subject of a criminal law without creating a constitutional problem, we cannot adopt a rule as broad as the government and dissent advocate without trampling on the fundamental right to freedom of speech. See Jonathan D. Varat, Deception and the First Amendment: A Central, Complex, and Somewhat Curious Relationship, 53 UCLA L.Rev. 1107, 1109 (2006) (“[AJccepting unlimited government power to prohibit all deception in all circumstances would invade our rights of free expression and belief to an intolerable degree, including most notably—and however counterintuitively—our rights to personal and political self rule.”). Rather we hold that regulations of false factual speech must, like other content-based speech restrictions, be subjected to strict scrutiny unless the statute is narrowly crafted to target the type of false factual speech previously held proscribable because it is not protected by the First Amendment.
The rule the government and dissent urge us to apply in order to uphold the Act would, if adopted, significantly enlarge the scope of existing categorical exceptions to First Amendment protection. All previous circumstances in which lies have been found proscribable involve not just knowing falsity, but additional elements that serve to narrow what speech may be punished. Indeed, if the Act is constitutional under the analysis proffered by Judge By-bee, then there would be no constitutional bar to criminalizing lying about one’s height, weight, age, or financial status on Match.com or Facebook, or falsely representing to one’s mother that one does not smoke, drink alcoholic beverages, is a virgin, or has not exceeded the speed limit while driving on the freeway. The sad fact is, most people lie about some aspects of their lives from time to time. Perhaps, in context, many of these lies are within the government’s legitimate reach. But the government cannot decide that some lies may not be told without a reviewing court’s undertaking a thoughtful analysis of the constitutional concerns raised by such government interference with speech.
Finding no appropriate way to avoid the First Amendment question Alvarez poses, we hold that the speech proscribed by the Act is not sufficiently confined to fit among the narrow categories of false speech previously held to be beyond the First Amendment’s protective sweep. We then apply strict scrutiny review to the Act, and hold it unconstitutional because it is not narrowly tailored to achieving a compelling governmental interest.
FACTUAL AND PROCEDURAL BACKGROUND
Xavier Alvarez won a seat on the Three Valley Water District Board of Directors in 2007. On July 23, 2007, at a joint meeting with a neighboring water district board, newly-seated Director Alvarez arose and introduced himself, stating “I’m a retired marine of 25 years. I retired in the year 2001. Back in 1987,1 was awarded the Congressional Medal of Honor. I got wounded many times by the same guy. I’m still around.”
Alvarez has never been awarded the Congressional Medal of Honor, nor has he spent a single day as a marine or in the *1201 service of any other branch of the United States armed forces. In short, with the exception of “I’m still around,” his self-introduction was nothing but a series of bizarre lies.
Alvarez’s misrepresentations during the 2007 water district board meeting were only the latest in a long string of fabrications. Apparently, Alvarez makes a hobby of lying about himself to make people think he is “a psycho from the mental ward with Rambo stories.” The summer before his election to the water district board, a woman informed the FBI about Alvarez’s propensity for making false claims about his military past. Alvarez told her that he won the Medal of Honor for rescuing the American Ambassador during the Iranian hostage crisis, and that he had been shot in the back as he returned to the embassy to save the American flag. Alvarez reportedly told another woman that he was a Vietnam veteran helicopter pilot who had been shot down but then, with the help of his buddies, was able to get the chopper back into the sky.
In addition to his lies about military service, Alvarez has claimed to have played hockey for the Detroit Red Wings, to have worked as a police officer (who was fired for using excessive force), and to have been secretly married to a Mexican starlet. As the district court observed, Alvarez “live[s] in a world, a make-believe world where [he] just make[s] up stories all the time.... [T]here’s no credibility in anything [he] say[s].”
After the FBI obtained a recording of the water district board meeting, Alvarez was indicted in the Central District of California on two counts of violating 18 U.S.C. § 704(b), (c)(1). Specifically, he was charged with “falsely representing] verbally that he had been awarded the Congressional Medal of Honor when, in truth and as [he] knew, he had not received the Congressional Medal of Honor.” Alvarez appears to be the first person charged and convicted under the present version of the Act.
Alvarez moved to dismiss the indictment, claiming that the Act is unconstitutional both on its face and as applied to him. The district court denied the motion. Alvarez then pleaded guilty to the first count, reserving his right to appeal the First Amendment question. He was sentenced to pay a $100 special assessment and a $5,000 fine, to serve three years of probation, and to perform 416 hours of community service. This case addresses Alvarez’s timely appeal of the constitutional issue.
JURISDICTION AND STANDARD OF REVIEW
Alvarez brings both facial and as-applied[2] challenges to the validity of the Act under the First Amendment. We review the constitutional question de novo. See Perry v. L.A. Police Dep’t, 121 F.3d 1365, 1367-68 (9th Cir.1997).
We have jurisdiction pursuant to 28 U.S.C. § 1291.
DISCUSSION
The Act provides:
*1202 Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.
18 U.S.C. § 704(b). The prescribed prison term is enhanced to one year if the decoration involved is the Congressional Medal of Honor, a distinguished-service cross, a Navy cross, an Air Force cross, a silver star, or a Purple Heart. Id. § 704(c), (d).
I
The Act proscribes false verbal or written representations about one’s being awarded Congressionally authorized military honors and decorations. The parties do not dispute that the Act “seek[s] to regulate ‘only ... words.’ ” Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (quoting Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)). Moreover, the Act targets words about a specific subject: military honors. The Act is plainly a content-based regulation of speech.
Content-based speech restrictions ordinarily are subjected to strict scrutiny. See United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). However, there is an exception to the ordinary rule for “certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem.” Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). As explained recently by the Supreme Court in United States v. Stevens:
“From 1791 to the present,” ... the First Amendment has “permitted restrictions upon the content of speech in a few limited areas,” and has never “include[d] a freedom to disregard these traditional limitations.” These “historic and traditional categories long familiar to the bar[ ]” [ ] includ[e] obscenity, defamation, fraud, incitement, and speech integral to criminal conduct....
— U.S. —, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (internal citations omitted); see also Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766 (explaining that unprotected speech includes “the lewd and obscene, the profane,[3] the libelous, and the insulting or ‘fighting’ words-those which by their very utterance inflict injury or tend to incite an immediate breach of the peace”); New York Times Co. v. Sullivan, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (listing, in defamation case, other low value speech categories as including: “insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business” (footnotes omitted)).
The primary argument advanced by the government, and our dissenting colleague, is that the speech targeted by the Act— demonstrably false statements about having received military honors—fits within those “well-defined” and “narrowly limited” classes of speech that are historically unprotected by the First Amendment. The government and the dissent rely on Gertz v. Robert Welch, Inc. and its progeny for the proposition that “the erroneous statement of fact is not worthy of constitutional protection.” 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *1203 Gertz, the Court classified false statements of fact as “belonging] to that category of utterances” that “ ‘are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.’ ” Id. at 340, 94 S.Ct. 2997 (quoting Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766). Thus, the government and the dissent conclude, regulations of false factual speech may be proscribed without constitutional problem—or even any constitutional scrutiny.
We disagree. Gertz does not stand for the absolute proposition advocated by the government and the dissent. See Nike, Inc. v. Kasky, 539 U.S. 654, 664, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003) (Stevens, J., concurring in dismissal of writ as improvidently granted) (noting that the Court’s statement in Gertz that false statements of fact are unprotected speech is “perhaps overbroad[ ]”). Rather, Gertz’s statement that false factual speech is unprotected, considered in isolation, omits discussion of essential constitutional qualifications on that proposition.
It has long been clear that First Amendment protection does not hinge on the truth of the matter expressed, see Sullivan, 376 U.S. at 271, 84 S.Ct. 710 (“Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth .... ”), nor does it hinge on the distinction between “facts” and “ideas,” see Nike, 539 U.S. at 678, 123 S.Ct. 2554 (Breyer, J., dissenting from dismissal of writ as improvidently granted) (“That the [document containing false statements] is factual in content does not argue against First Amendment protection, for facts, sometimes facts alone, will sway our views on issues of public policy.”). Although statements characterized by both falsity and factualness have never been protected “for [their] own sake,” Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the “First Amendment requires that we protect some falsehood in order to protect speech that matters,” Gertz, 418 U.S. at 341, 94 S.Ct. 2997. As eloquently explained in Sullivan,
[t]o persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.
... [Erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the breathing space that they need to survive.
376 U.S. at 271-72, 84 S.Ct. 710 (internal quotation marks and ellipsis omitted) (emphases added). Thus, while some false factual speech may be proscribable, the Supreme Court has shown that not all of it is. We next consider how the distinction is made.
II
We begin by noting our rejection of the government’s suggestion that because “[f|alse statements of fact are particularly valueless,” Hustler Magazine v. Falwell, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), “Congress may prohibit false statements of fact unless immunity has been carved out or should be carved out because the First Amendment requires protection of some falsehood in order to protect speech that matters.” In other words, the government contends that there is no protection for false statements of fact unless it can be shown, in a particular case, that there should be.
*1204 Contrary to the dissent’s view, we cannot adopt the government’s approach as the general rule for false factual speech without turning customary First Amendment analysis on its head.
First, under the government’s proposed approach, it would effectively become the speaker’s burden to prove that his false statement should be protected from criminal prosecution. That approach runs contrary to Supreme Court precedent. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776-77, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (“In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified.”); see also Sullivan, 376 U.S. at 271, 84 S.Ct. 710 (“Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth ... especially one that puts the burden of proving truth on the speaker.”).
Second, the government’s approach would give it license to interfere significantly with our private and public conversations. Placing the presumption in favor of regulation, as the government and dissent’s proposed rule does, would steadily undermine the foundations of the First Amendment. In Cohen v. California, the Court rejected state regulation of profanity because “the principle contended for by the State seems inherently boundless. How is one to distinguish this from any other offensive word?” 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). This case is to that extent analogous. How, based on the principle proposed by the government, would one distinguish the relative value of lies about one’s receipt of a military decoration from the relative value of any other false statement of fact?[4] The government argues that the “protection of false claims of receipt of military honors is not necessary to a free press, to free political expression, or otherwise to promote the marketplace of ideas.” But in nearly every case, an isolated demonstrably false statement will be not be considered “necessary” to promoting core First Amendment values, and will often be contrary to it. In nearly every ease, the false statement will be outweighed by the perceived harm the lie inflicts on the truth-seeking function of the marketplace of ideas. Using such an approach, the government would almost always succeed. However, such an approach is inconsistent with the maintenance of a robust and uninhibited marketplace of ideas. See Stevens, 130 S.Ct. at 1585 (explaining that the government’s suggestion that “[wjhether a given category of speech enjoys First Amendment protection depends upon a categorical balancing of the value of the speech *1205 against its societal costs” is “startling and dangerous”). “The First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits.” Id. The language from Chaplinsky, borrowed in Gertz to establish that false factual statements are “of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality,” Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766, “do[es] not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary[.]” Stevens, 130 S.Ct. at 1586.[5]
Profanity and deliberately false statements of fact rarely contribute meaningfully to public debate over important issues, but
[t]he constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us....
... We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.
Cohen, 403 U.S. at 24-25, 91 S.Ct. 1780 (emphasis added).
There is certainly no unbridled constitutional right to lie such that any regulation of lying must be subjected to strict scrutiny. However, the right to speak and write whatever one chooses—including, to some degree, worthless, offensive, and demonstrable untruths—without cowering in fear of a powerful government is, in our view, an essential component of the protection afforded by the First Amendment. The dissent accuses us of confusing rules with exceptions, but with due respect, we disagree with his postulate that we must commence our constitutional analysis with the understanding that all false factual speech is unprotected. The fundamental rule is found in the First Amendment itself: “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. Any rule that certain speech is not protected by this foundational principle is the exception, which may in turn be subject to other exceptions to protect against such exceptions swallowing the rule.
In other words, we presumptively protect all speech against government interference, leaving it to the government to demonstrate, either through a well-crafted statute or case-specific application, the historical basis for or a compelling need to remove some speech from protection (in this case, for some reason other than the mere fact that it is a lie). Though such an approach may result in protection for a number of lies, which are often nothing more than the “distasteful abuse of [the First Amendment] privilege,” Cohen, 403 U.S. at 25, 91 S.Ct. 1780, it is constitutionally required because the general freedom from government interference with speech, and the general freedom to engage in public and private conversations without the government injecting itself into the discus *1206 sion as the arbiter of truth, contribute to the “breathing space” the First Amendment needs to survive. See Steven G. Gey, The First Amendment and the Dissemination of Socially Worthless Untruths, 36 Fla. St. U.L.Rev. 1, 21-22 (2008). “The First Amendment, said Judge Learned Hand, ‘presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.’ ” Sullivan, 376 U.S. at 270, 84 S.Ct. 710 (quoting United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943)). “The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.” Stevens, 130 S.Ct. at 1585.
Ill
If the speech targeted by the Act is to be declared among those classes of speech which can be prohibited without any constitutional problem (the exceptions to the First Amendment), the speech must fit within those “historical and traditional categories long familiar to the bar.” Id. at 1584 (internal quotation marks omitted). We find no authority holding that false factual speech, as a general category unto itself, is among them.[6]
A
Gertz involved a libel action by a private citizen against a newspaper for the newspaper’s reckless printing of an accusation that the plaintiff was a Communist. 418 U.S. at 326-27, 94 S.Ct. 2997. The Court began with the “common ground” that “there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society’s interest in ‘uninhibited, robust, and wide-open’ debate on public issues.” Id. at 339-340, 94 S.Ct. 2997 (quoting Sullivan, 376 U.S. at 270, 84 S.Ct. 710). But the Court did not end there. Rather, it emphasized that “[ajlthough the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate.” Id. at 340, 94 S.Ct. 2997. Therefore, “[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters.” Id. at 341, 94 S.Ct. 2997. To distinguish between the falsehood related to a matter of public concern that is protected and that which is unprotected, Gertz held that there must be an element of fault. Id. at 347, 94 S.Ct. 2997. Indeed, the Court has consistently held that when a speaker publishes a false statement of fact about a matter of public concern, such a statement can be punished only upon some showing of malice (as opposed to mere negligence),[7] because the malice requirement avoids the potential *1207 for punishing speakers who simply make innocent errors. See Sullivan, 376 U.S. at 283, 84 S.Ct. 710. The First Amendment is concerned with preventing punishment of innocent mistakes because the prospect of punishment for such speech “runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.” Gertz, 418 U.S. at 340, 94 S.Ct. 2997. Thus, many false factual statements are shielded by the First Amendment even under Gertz, regardless of how valueless they may be. This is emphasized in Garrison v. Louisiana, in which the Court clarified “the knowingly false statement ... do[es] not enjoy constitutional protection.” 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (emphasis added); see also Sullivan, 376 U.S. at 283, 84 S.Ct. 710.
Moreover, Garrison’s clarification is not the only relevant refinement. In defamation jurisprudence, the question has never been simply whether the speech “forfeits [First Amendment] protection by the falsity of some of its factual statements.” Sullivan, 376 U.S. at 271, 84 S.Ct. 710. The question is always whether the speech forfeits its First Amendment protection as a result of its falsity “and by its alleged defamation of [the plaintiff].” Id. (emphasis added). In other words, in a defamation case, a threshold question is whether the false speech at issue is defamatory, meaning that the defamer’s false statement is the proximate cause of an irreparable[8] harm to another’s reputation. See Gertz, 418 U.S. at 327, 94 S.Ct. 2997 (holding that “so long as they do not impose liability without fault, the States may ... [impose] liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual”).
Since the Stevens Court saw fit to name defamation specifically, rather than false statements of fact generally, as the historical category excluded from constitutional protection, we believe the historical category of unprotected speech identified in Gertz and related law is defamation, not all false factual speech. The dissent erroneously relies on Gertz for its statement that *1208 false factual speech is valueless and unprotected, while ignoring what Gertz actually held, and how the Court in Gertz framed the issues and carefully analyzed the First Amendment questions raised in the case. Our dissenting colleague does not, because he cannot, provide any citation to relevant authority that follows his suggested approach, in which the Court characterizes a law as targeting false factual speech under the language of Gertz and resolves the case in the government’s favor without engaging in any First Amendment analysis at all.[9] Unlike our dissenting colleague, we are not eager to extend a statement (often quoted, but often qualified) made in the complicated area of defamation jurisprudence into a new context in order to justify an unprecedented and vast exception to First Amendment guarantees.[10] *1209 Indeed, Stevens instructs us not to do so: “Our decisions [following Chaplinsky ] cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment.” 130 S.Ct. at 1586.
With this constitutional background in mind, we next consider whether the Act fits into the defamation category. We assume that receipt of military decorations is a matter of public concern, as it primarily involves Congressional and military recognition of public service. The Act, however, does not require a malicious violation, nor does it contain any other requirement or element of scienter (collectively, a scienter requirement). Without a scienter requirement to limit the Act’s application, the statute raises serious constitutional concerns under defamation jurisprudence because the First Amendment clearly prohibits criminally punishing negligent speech about matters of public concern. See Gertz, 418 U.S. at 340, 347, 94 S.Ct. 2997.
To avoid such a result, the government preemptively suggested at oral argument that a scienter requirement can be read into the Act. Adopting the government’s suggestion (even though the Act presently includes no express scienter element) would require us to construe the Act to include a requirement that the government prove that the defendant spoke with malice. See Staples v. United States, 511 U.S. 600, 604-06, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); Osborne v. Ohio, 495 U.S. 103, 115, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). If a scienter requirement would save the statute, we would be obliged to read it in if possible. See Gray v. First Winthrop Corp., 989 F.2d 1564, 1568 (9th Cir.1993). Such an approach might be reasonable since most people know the truth about themselves, thereby permitting us to construe the Act to require a knowing violation. Indeed, the government charged Alvarez with knowingly making the false statement.
But that is not enough. The Court has never held that a person can be liable for defamation merely for spreading knowingly false statements. The speech must also be “injurious to a private individual.” Gertz, 418 U.S. at 347, 94 S.Ct. 2997.
Of course, if we look beyond the text of the Act, there is a presumptive harm identified by Congress that might be analogized to the presumption of reputational harm made in defamation cases. Specifically, Congress made “Findings” that “fraudulent claims” about receipt of military honors “damage the reputation and meaning of such decorations and medals.” Stolen Valor Act of 2005, Pub.L. No. 109-437, § 2(1), 120 Stat. at 3266; see also 151 Cong. Rec. S12684-01, S12688-99 (2005) (statement of Sen. Conrad). We do not believe the “Findings” make this a defamation statute.
First, while the “Findings” identify the injury the Act targets, they do not actually *1210 limit the application of the Act. There is no requirement in the Act that the government bear the burden to prove that the defendant’s speech or writing proximately caused damage to the reputation and meaning of military decorations and medals. Although common law traditions suggest that we can sometimes presume damage in defamation cases, see Gertz, 418 U.S. at 349-402, 94 S.Ct. 2997, there is no readily apparent reason for assuming, without specific proof, that the reputation and meaning of military decorations is harmed every time someone lies about having received one. To the contrary, the most obvious reason people lie about receiving military honors is because they believe that their being perceived as recipients of such honors brings them acclaim, suggesting that generally the integrity and reputation of such honors remain unimpaired. And notably, even in defamation cases, a “publication” is required, ensuring that liability attaches only to those falsehoods spoken under circumstances in which the harm could result. In this case, however, we cannot ignore the fact that nothing in the Act requires a showing of either (1) publicity or (2) victims. Alvarez made his statement in a water district board meeting; it would have made no difference under the Act if he had he made the statement in the privacy of his home at a family dinner.
More importantly, even if it were justifiable to presume that harm to the meaning and reputation of military decorations occurs whenever a false claim concerning their receipt or possession is made, the government may not restrict speech as a means of self-preservation. The right against defamation belongs to natural persons, not to governmental institutions or symbols. See Sullivan, 376 U.S. at 291, 84 S.Ct. 710 (“ ‘[N]o court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.’ ” (quoting City of Chicago v. Tribune Co., 307 Ill. 595, 139 N.E. 86, 88 (1923)) (emphasis added)). Preserving the value of military decorations is unquestionably an appropriate and worthy governmental objective that Congress may achieve through, for example, publicizing the names of legitimate recipients or false claimants,[11] creating educational programs, prohibiting the act of posing as a veteran to obtain certain benefits, or otherwise more carefully circumscribing what is required to violate the Act. But the First Amendment does not permit the government to pursue this sort of objective by means of a pure speech regulation like the one contained in the Act. See Texas v. Johnson, 491 U.S. 397, 418-20, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (“To say that the government has an interest in encouraging proper treatment of the flag, however, is not to say that it may criminally punish a person for burning a flag as a means of political protest.”); see also Schacht v. United States, 398 U.S. 58, 63, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (“An actor, like everyone else in our country, enjoys a constitutional right to freedom of speech, including the right openly to criticize the Government during a dramatic performance. The last clause of [10 U.S.C. § 772(f) ] denies this constitutional right to an actor who is wearing a military uniform by making it a crime for him to say things that tend to bring the military into discredit and disrepute.”).
*1211 Finally, even assuming the Act prevents a harm legitimately preventable by means of a speech or writing restriction, to say that the Act in its current form fits within defamation doctrine would require us to ignore the nature of the harm against which the defamation law is intended to protect. A victim’s right to recovery for defamation trumps the defamer’s First Amendment interests because, when it comes to defamatory falsehoods, “the truth rarely catches up with a lie” so the “opportunity for rebuttal seldom suffices to undo harm.” Gertz, 418 U.S. at 344 n. 9, 94 S.Ct. 2997; see also Hustler, 485 U.S. at 52, 108 S.Ct. 876 (explaining that defamatory falsehoods “cause damage to an individual’s reputation that cannot easily be repaired by counterspeech, however persuasive or effective”). The harm caused by defamation is thought to be irreparable even when the truth is brought to light. Here, in contrast, when someone falsely claims to have been awarded a Congressionally-authorized medal, and his or her false claims are exposed as self-aggrandizing lies, scandal results, and counter-speech can vindicate the truth in a way the law presumes rebuttal of defamatory falsehoods cannot. Indeed, Alvarez was perceived as a phony even before the FBI began investigating him, and he has since been publicly humiliated in his community and in the press (one online article described him as an “idiot,” and another post described him as a “jerk”). When valueless false speech, even proscribable speech, can best be checked with more speech, a law criminalizing the speech is inconsistent with the principles underlying the First Amendment. See infra pp. 1216-17.
Thus, the Act is not sufficiently analogous to an antidefamation law to bring it within the scope of the historical First Amendment exception for laws punishing defamation.
B
Moving beyond defamation, there are other of the historical categories that may involve false factual speech—fraud and, to a certain extent, speech that is integral to criminal conduct. It is obvious, however, that these categories also include limiting characteristics to what speech may be proscribed beyond mere falsity, just as defamation law does.
Fraud statutes must be precisely crafted to target only specific false statements that are likely to cause a bona fide harm.
[I]n a properly tailored fraud action the State bears the full burden of proof. False statement alone does not subject a [speaker] to fraud liability____ [T]o prove a defendant liable for fraud, the complainant must show that the defendant made a false representation of a material fact knowing that the representation was false; further, the complainant must demonstrate that the defendant made the representation with the intent to mislead the listener, and succeeded in doing so.
Ill. ex rel. Madigan v. Telemarketing Assocs, Inc., 538 U.S. 600, 620, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003).
Even laws about perjury or fraudulent administrative filings—arguably the purest regulations of false statements of fact— require at a minimum that the misrepresentation be willful, material, and uttered under circumstances in which the misrepresentation is designed to cause an injury, either to the proper functioning of government (when one is under an affirmative obligation of honesty) or to the government’s or a private person’s economic interests. See, e.g., United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (“A witness testifying under oath or affirmation violates [the perjury statute, 18 U.S.C. § 1621] if she gives false testimony concerning a material *1212 matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.” (emphases added)); 18 U.S.C. § 1035 (prohibiting knowing and willful, material false statements made to obtain health care benefits, (emphasis added)). Into this area of the law we would also place Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1262 (9th Cir.1982) (holding that the First Amendment does not protect deliberately misrepresenting facts to an administrative body for anticompetitive purposes).[12] Thus, falsity alone is not enough. The context must be well-defined.
In addition, impersonation statutes are drafted to apply narrowly to conduct performed in order to obtain, at a cost to another, a benefit to which one is not entitled. See 18 U.S.C. § 912 (“Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.” (emphases added)).
Since Congress apparently intended the Act to be used to stop fraud, comparing the Act to fraud laws strikingly illustrates the Act’s infirmities. In a “properly tailored fraud action” “[fjalse statement alone does not subject a [speaker] to fraud liability.” Ill. ex rel. Madigan, 538 U.S. at 620, 123 S.Ct. 1829. Rather, there must be proof the false statement was (1) knowing and intended to mislead, (2) material, and (3) did mislead. Id. The Act, even were we to read a “knowingly” element into it, see supra p. 1209, still lacks the critical materiality, intent to defraud, and injury elements. Indeed, Alvarez pleaded guilty simply to making a knowingly false statement. The government was not required to allege that the statement was material, intended to mislead, or most critically, did mislead the listener. Rather, the record here shows, if anything, Alvarez has no credibility whatsoever and that no one detrimentally relied on his false statement. Although we believe that Congress could revisit the Act to modify it into a properly tailored fraud statute, we are not permitted to suggest how it could be done, since such would be a “ ‘serious invasion of the legislative domain.’ ” Stevens, 130 S.Ct. at 1592 (quoting United States v. Nat’l Treasury Employees Union, 513 U.S. 454, 479 n. 26, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995)). Accordingly, we cannot construe the Act as falling within the historical First Amendment exception for anti-fraud laws.
Somewhat relatedly, criminal conduct is not immunized “merely because the conduct was in part initiated, evidenced, or *1213 carried out by means of language, either spoken, written, or printed.” Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949). Thus, laws focused on criminal conduct— like perjury or tax or administrative fraud or impersonating an officer—raise no constitutional concerns even though they can be violated by means of speech. Unlike such uncontroversial criminal laws, however, the Act makes criminal the speech itself regardless of any defining context that assures us the law targets legitimately criminal conduct.[13] Here again, Alvarez was not prosecuted for impersonating a military officer, or lying under oath, or making false statements in order to unlawfully obtain benefits. There was not even a requirement the government prove he intended to mislead. He was prosecuted simply for saying something that was not true. Without any element requiring the speech to be related to criminal conduct, this historical exception from the First Amendment does not apply to the Act as drafted.
C
In sum, our review of pertinent case law convinces us that the historical and traditional categories of unprotected false factual speech have thus far included only certain subsets of false factual statements, carefully defined to target behavior that is most properly characterized as fraudulent, dangerous, or injurious conduct, and not as pure speech. We are aware of no authority holding that the government may, through a criminal law, prohibit speech simply because it is knowingly factually false.
Precedent makes clear that knowing factual error is insufficient “to remove the constitutional shield from criticism of official conduct.” Sullivan, 376 U.S. at 273, 84 S.Ct. 710. Hence the historical rejection of the validity of the Alien and Sedition Act, which “made it a crime, punishable by a $5,000 fine and five years in prison, ‘if any person shall write, print, utter or publish ... any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress ..., or the President ... with intent to defame ... or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States.’ ” Id. at 273-34, 84 S.Ct. 710 (quoting Sedition Act of 1798, 1 Stat. 596). Thus, even though some knowing false statements may be proscribed, that proscription cannot be universal.
Moreover, there can be no doubt that there is affirmative constitutional value in at least some knowingly false statements of fact. Satirical entertainment such as The Onion, The Daily Show, and The Colbert Report thrives on making deliberate false statements of fact. Such media outlets play a significant role in inviting citizens alienated by mainstream news media into meaningful public debate over economic, military, political and social issues. However, even if such satirical writings and shows did not invite attention to and comment about issues of “public importance,” would anyone with even a rudimentary knowledge of First Amendment law seriously argue that the satirical, false statements frequently contained in such *1214 writing and programming are categorically outside First Amendment protection? See Sullivan, 376 U.S. at 279 n. 19, 84 S.Ct. 710 (“Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about ‘the clearer perception and livelier impression of truth, produced by its collision with error.’ ” (quoting John Stuart Mill, On Liberty 15 (Oxford: Blackwell 1947))). Further, whether it be method actors getting into character, satirists being ironic or sarcastic, poets using hyperbole, or authors crafting a story, creative persons often make factual statements or assertions which, as they are fully aware, are entirely untrue. Such creative uses of knowingly false speech are highly protected. Cf Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (requiring obscenity statutes to apply only to works that “taken as a whole, do not have serious literary, artistic, political, or scientific value”).
Thus, false factual speech as a general category is not, and cannot be, proscribed under threat of criminal prosecution. Although certain subsets of false factual speech have been declared unprotected, such classes of speech were developed as the result of thoughtful constitutional analysis of what other characteristics the speech must have before it can be proscribed without clashing with First Amendment protections. The Act does not fit neatly into any of those “well-defined” and “narrowly limited” classes of speech previously considered unprotected, and we thus are required to apply the highest level of scrutiny in our analysis.
IV
Before performing the customary First Amendment analysis, however, we consider alternatively what may perhaps be better authority for the view that the maliciously stated false factual speech is historically unprotected—not Gertz and the unique universe of defamation jurisprudence, or the law of fraud, but Schenck v. United States, as suggested by Alvarez in his appeal. There, Justice Holmes famously noted that “[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic.” 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Although Schenck was concerned with seditious speech, it is particularly instructive here, given that the “clear and present danger” test emerged from the “fire in a theater” hypothetical, which is quintessentially about a false statement of fact.
Generalizing from the “fire in a theater” hypothetical, Justice Holmes went on to hold that “[t]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.” Id. (emphasis added). To the extent we are even free to look beyond defamation and fraud for a more general rule concerning prohibition of false factual speech, we agree with Alvarez that the rule from Schenck might supply a helpful guideline for defining the relevant subset of false speech that is historically unprotected.[14] *1215 Indeed, Schenck’s requirements that any restricted speech be uttered under circumstances likely to be the proximate cause of an imminent harm within the scope of Congress’ legitimate reach are highly relevant to the classes of false factual speech we have already identified—defamation, fraud, and speech integral to criminal conduct—and other classes of speech historically held to be unworthy of constitutional protection. See, e.g., Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (“[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent laioless action and is likely to incite or produce such action.” (emphases added)); Virginia v. Black, 538 U.S. 343, 360, 363, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (permitting prohibition of “cross burnings done with the intent to intimidate” because “[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person ... with the intent of placing the victim in fear of bodily harm or death” (emphases added)); Chaplinsky, 315 U.S. at 573, 62 S.Ct. 766 (“It is a statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace.” (emphasis added)).
Following Schenck, then, we might articulate the class of false factual speech unprotected by the First Amendment to be that false factual speech which creates a clear and present danger of a harm Congress has a right to prevent. Assuming that the “clear and present danger” test is the more appropriate rule, as Alvarez urges us to do, we agree with him that the Act fails the test for the same reasons the Act is not analogous to anti-defamation laws.
As explained in Schenck, the power of the government to punish such speech involves careful consideration of “proximity and degree” of the harm. For the reasons already substantially described supra in Part III.A, the speech targeted by the Act does not pose any immediate and irreparable harm; any harm it does cause can be remedied by more speech. Further, the harm the Act identifies—damage to the reputation and meaning of military honors—is not the sort of harm we are convinced Congress has a legitimate right to prevent by means of restricting speech.
V
Having concluded that the Act does not fit within the traditional categories of speech excluded from First Amendment protection, we must subject it to strict scrutiny review. Indeed,
[e]ven as to [the narrowly limited classes of speech noted in Chaplinsky ] ... because the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn ... the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom!.] In other words, the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression. Because First Amendment freedoms need breathing space to survive, government *1216 may regulate the area only with narrow specificity.
Gooding, 405 U.S. at 522, 92 S.Ct. 1103 (internal quotation marks and citations omitted) (emphases added); see also Reno v. Am. Civil Liberties Union, 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (explaining that the First Amendment requires that statutes targeting the content of speech must be drafted with “precision”). The Court has always carefully considered the contours of regulations purporting to target “unprotected” speech; here, being unconvinced the Act even targets such “unprotected” speech, we are even more mindful of our obligation to ensure the statute is narrowly drawn.
The strict scrutiny standard of review is familiar: the government must show that the law is narrowly tailored to achieve a compelling governmental interest. Citizens United v. Fed. Election Comm’n, — U.S.-, 130 S.Ct. 876, 898, — L.Ed.2d - (2010). A law is not narrowly tailored when less speech-restrictive means exist to achieve the interest. See Reno, 521 U.S. at 874, 117 S.Ct. 2329 (holding that although adult content is unprotected as to children, it is protected as to adults, so a law imposing a “burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve”). Even the dissent agrees that the Act fails strict scrutiny. Dissent at n. 10.
The asserted governmental interest at issue in the Act is to prevent “fraudulent claims” about receipt of military honors, such claims causing “damage the reputation and meaning of such decorations and medals.” Stolen Valor Act of 2005, Pub.L. No. 109-437, § 2(1), 120 Stat. at 3266; see also 151 Cong. Rec. S12684-01, S12688-99 (2005) (statement of Sen. Conrad). The government argues that the referenced interest is important to motivating our military. Especially at a time in which our nation is engaged in the longest war in its history, Congress certainly has an interest, even a compelling interest, in preserving the integrity of its system of honoring our military men and women for their service and, at times, their sacrifice.
However, the government has not proven here that the speech restriction is a narrowly tailored means of achieving that noble interest. In Brown v. Hartlage, the Supreme Court explained,
Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech [or, in this case, the state interest in protecting the integrity of our national military decoration system] is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount. Whenever compatible with the underlying interests at stake, under the regime of that Amendment “we depend for ... correction not on the conscience of judges and juries but on the competition of other ideas.” In a political campaign, a candidate’s factual blunder is unlikely to escape the notice of, and correction by, the erring candidate’s political opponent. The preferred First Amendment remedy of “more speech, not enforced silence,” thus has special force.
456 U.S. 45, 61, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) (quoting Gertz, 418 U.S. at 339-404, 94 S.Ct. 2997, and Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandéis, J., concurring)) (ellipses in original). Here, Alvarez’s lie, deliberate and despicable as it may have been, did not escape notice and correction in the marketplace. The preferred First Amendment remedy of “more speech” thus was available to repair any harm. See also Johnson, 491 U.S. at 419, *1217 109 S.Ct. 2533 (“ ‘[N]o danger flowing from speech can be deemed dear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.’ ” (quoting Whitney, 274 U.S. at 377, 47 S.Ct. 641 (Brandéis, J., concurring))).
On this record it is speculative at best to conclude that criminally-punishing lies about having received Congressionallyawarded medals is the best and only way to ensure the integrity of such medals— after all, it seems just as likely that the reputation and meaning of such medals is wholly unaffected by those who lie about having received them. The greatest damage done seems to be to the reputations of the liars themselves. See supra pp. 1210-11; see also United States v. Hinkson, 611 F.3d 1098, 1114 (9th Cir.2010) (W. Fletcher, J., dissenting from denial of en banc panel rehearing) (arguing that witness’ credibility would have been impeached had his lie about having received a Purple Heart been exposed to the jury). Further, even assuming that there is general harm to the meaning of military honors caused by numerous imposters, other means exist to achieve the interest of stopping such fraud, such as by using more speech, or redrafting the Act to target actual impersonation or fraud. See supra pp. 1211-12.
Further, we agree with the reasoning of the District Court of Colorado that suggesting “that the battlefield heroism of our servicemen and women is motivated in any way ... by considerations of whether a medal may be awarded simply defies ... comprehension” and is “unintentionally insulting to the profound sacrifices of military personnel the Stolen Valor Act purports to honor.” United States v. Strandlof, No. 09-cr-00497-REB, 2010 WL 2802691 (D.Colo. Jul.16, 2010). Even if we were to make the unfounded assumption that our troops perform their riskiest missions in the hope of receiving the Medal of Honor, there is no evidence—nor any reasonable basis for assuming—that some people’s false claims to have received the medal has a demotivating impact on our men and women in uniform.
In sum, honoring and motivating our troops are doubtless important governmental interests, but we fail to see how the Act is necessary to achieving either aim. Accordingly, we hold- that the Act is not narrowly tailored to achieve a compelling governmental interest. As presently drafted, the Act is facially invalid under the First Amendment, and was unconstitutionally applied to make a criminal out of a man who was proven to be nothing more than a liar, without more.[15]
We have no doubt that society would be better off if Alvarez would stop spreading worthless, ridiculous, and offensive untruths. But, given our historical skepticism of permitting the government to police the line between truth and falsity, and between valuable speech and drivel, we presumptively protect all speech, including false statements, in order that clearly protected speech may flower in the shelter of the First Amendment. The government *1218 has not rebutted that presumption here because the Act is not sufficiently analogous to traditional permissible restrictions on false speech.
CONCLUSION
In order to advance Congress’s praiseworthy efforts to stop fraudulent claims about having received Congressionally authorized military honors, the government would have us extend inapposite case law to create an unprecedented exception to First Amendment guarantees. We decline to follow such a course, and hold that the Act lacks the elements that would make it analogous to the other restrictions on false speech previously held to be proscribable without constitutional problem. Accordingly, we hold that the Act is not narrowly drawn to achieve a compelling governmental interest, and is unconstitutional.
REVERSED. The case is REMANDED to the district court for proceedings consistent with this opinion.

. Although predecessor versions have existed since 1948, the current form of the Act was passed in 2006. In that year, Congress found that ''[fjraudulent claims surrounding the receipt of the Medal of Honor [and other Congressionally authorized military medals, decorations, and awards] damage the reputation and meaning of such decorations and medals,” and that "[[legislative action is necessary to permit law enforcement officers to protect the reputation and meaning of military decorations and medals.” Stolen Valor Act of 2005, Pub.L. No. 109-437, § 2(1), (3), 120 Stat. 3266, 3266 (2006).

. Because, as described further infra, the Act is so broadly drafted, the government was not required to prove anything before the district court except that Alvarez made a false statement about his having received the Congressional Medal of Honor—to which Alvarez pleaded guilty. Accordingly, we know very little about what other evidence the government might have been able to introduce in order to prove that Alvarez’s particular statements were unprotected. For instance, some evidence in the record suggests he might have made the false claim at issue, or similar misrepresentations, in order to fraudulently obtain certain benefits.

. Since Chaplinsky's list is outdated, see Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (holding profanity is protected by the First Amendment), we find the current list in Stevens to be the most pertinent.

. One possible answer to this question is to use the mode of analysis outlined in R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), which holds that even entirely unprotected content cannot be targeted on the basis of view-point. Even here, given that one could frame the Congressional intent behind the Act as intending to prevent telling lies that tend to disparage military, concerns about possible viewpoint discrimination may be legitimate. However, laws targeting false statements of fact, including this one, are unlikely to directly express or relate to an identifiable viewpoint, meaning that the exception in R.A.V. for cases in which "there is no realistic possibility that official suppression of ideas is afoot," id. at 390, 112 S.Ct. 2538 (emphasis added), would probably apply. Thus, given the difficulty of identifying the potential viewpoint discrimination afoot in laws targeting false statements about simple, demonstrable facts, we do not rely primarily on R.A.V. to sort between permissible and impermissible restrictions on speaking false statements of fact. We acknowledge, however, that R.A.V. might help us avoid plunging down a logical slippery slope.

. Although the dissent denies the proposed rule would result in ad hoc balancing, his own analysis shows that it does. See Dissent at p. 1233 (explaining that the Act does not cover speech that matters because "the harm from public officials outright lying to the pub-lie on matters of public record should be obvious” and that “our public discourse will not be worse for the loss” caused by chilling "false autobiographical claims by public officials such as Alvarez”).

. Of course, in the area of commercial speech, the analysis that follows might be very different. Here, there is no suggestion that the Act targets commercial speech, and therefore we do not address commercial speech given the unique way in which it is treated under the First Amendment. However, we are additionally persuaded that upholding the Act would require a novel extension of Gertz by the fact that, even in the context of commercial speech, knowingly false factual speech about a matter of public concern is potentially entitled to heightened First Amendment scrutiny. See Nike, 539 U.S. 654, 123 S.Ct. 2554, 156 L.Ed.2d 580 (dismissing—with a highly fractured Court—certiorari as improvidently granted in a case involving the question of whether false speech with both commercial and public interest aspects is entitled to a degree of First Amendment protection).

. A false statement of fact can be punished upon a showing of mere negligence in the context of purely private defamation. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., *1207 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Because we take the statements at issue here to be of public concern, and because a violation of the Act calls for the imposition of a criminal penalty on the violator for speaking about a matter of public concern, an element of malice (at least reckless disregard for the truth or falsity of the statement) is necessary to its constitutionality, assuming defamation jurisprudence even governs this case.

. On the importance of irreparability, see infra pp. 1207-11, 1216-17. The dissent argues at length that we have conjured up this harm element out of whole cloth, see Dissent at p. 1234, but it comes directly from several of the cases about "unprotected” speech. See, e.g., Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766 (identifying fighting words as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace”) (emphasis added); Gertz, 418 U.S. at 347, 94 S.Ct. 2997 (describing defamation as "injurious”). We do not mean to suggest, however, that harm is necessarily a required element for all unprotected speech regulations (although we find it interesting that it is present in many of them); rather, we note here only that it is a required element of defamation. Defamation, like every "unprotected” category, involves thoughtful and unique definitional analysis, see infra n. 9. Even obscenity doctrine, which the dissent argues includes no harm element, still requires the statute to define "obscenity" in conformity with the constitutional rule. See, e.g., Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (reaffirming that obscenity is unprotected, but holding the an anti-obscenity statute must be carefully drafted or construed to meet First Amendment standards). Thus, if defamation law supplies the rule to be applied in this case, we cannot ignore that the definition of defamation includes injury to reputation. See, e.g., Gertz, 418 U.S. at 347, 94 S.Ct. 2997; Sullivan, 376 U.S. at 271, 84 S.Ct. 710; Dun & Bradstreet, 472 U.S. at 762, 105 S.Ct. 2939.

. If Judge Bybee is correct, the opinion in this case would need to be no more titan a few paragraphs in length. See Dissent at pp. 1231-32. Starting with the premise that false statements are unprotected, he believes it therefore follows that the First Amendment presumptively does not apply. He takes one step back to consider briefly whether there is any need to protect the particular false statements targeted by the Act in order to ensure robust political speech, and seeing none, concludes there is no First Amendment issue. The opinion would end there.
Of course, the First Amendment requires more. That is why even in "unprotected” speech cases, the First Amendment analysis is nonetheless rigorous. See Sullivan, 376 U.S. at 268, 84 S.Ct. 710 ("Like insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment.’’) (footnotes omitted) (emphasis added); see also Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (articulating First Amendment test for incitement); Gooding, 405 U.S. at 522, 92 S.Ct. 1103 (requiring fighting words restrictions to be "carefully drawn”); Ill. ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 619, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003) (requiring fraud statute to be properly tailored); Miller v. California, 413 U.S. 15, 23-24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (articulating "carefully limited” test for obscenity regulations); Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (engaging in First Amendment analysis to determine test for true threat regulations); Va. State Bd. of Pharmacy, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (applying intermediate scrutiny to commercial speech). That is also why restrictions on "unprotected” speech are at times invalidated. See, e.g., Cohen, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (rejecting, on First Amendment grounds, restrictions of profanity); Gooding, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (striking down fighting words statute); Hustler, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (prohibiting recovery for emotional distress in libel action); Reno v. Am. Civil Liberties Union, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (finding portions of Communications Decency Act invalid under the First Amendment). Thus, even if one agrees with the dissent that Gertz and its progeny requires the historical category of unprotected speech at issue here be defined as knowingly false factual speech per se, that is simply not enough to make the Act immune from First Amendment analysis. Judge Bybee’s approach excepting "some falsehood” when it is necessary to protecting speech that matters reintroduces some First Amendment scrutiny into it, but we believe that approach is not sufficiently speech-protective for the reasons explained supra pp. 1205-06. If Judge Bybee is correct, then, we will need an entirely new constitutional rule for false speech regulations. Rather than guess what rule the Court would adopt for this newly-broadened category of unprotected speech, we confine our review to previously defined unprotected categories.

. We are not persuaded that Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180 (9th Cir.2001), is anything more than a variation on defamation jurisprudence. Hoffman applied the actual malice standard from GertzGarrison-Sullivan in a case involving a magazine’s alleged creation of a false impression that a famous actor posed for a photograph. Id. at 1187; cf. also Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) *1209 (holding constitutional a state law imposing civil liability for malicious false statements that invade a private individual's right of privacy). Although the asserted injury in Hoffman is not to reputation, but instead to a form of publicity rights, the interests at stake are sufficiently similar to defamation that the Gertz-Garrison-Sullivan framework can conceptually apply without a significant extension of the doctrine. When the only asserted injury is to the reputation of a government institution, the historical basis for finding that the "social interest in order and morality” outweighs the value of precluding government interference with speech is absent. Chaplinsky, 315 U.S. at 571-72, 62 S.Ct. 766; see Gertz, 418 U.S. at 341, 94 S.Ct. 2997 ("The need to avoid self-censorship by the news media is ... not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation.” (emphasis added)).

. Indeed, Congress and other organizations already make such lists publicly available. See Congressional Medal of Honor Society, Recipients, http://www.cmohs.org (last accessed Mar. 31, 2010); Congressional Medal of Honor Foundation, http://www. cmohfoundation.org (last accessed Mar. 31, 2010).

. Clipper Exxpress supports the cautionary holding we reach today. In that case, we explained:
The first amendment has not been interpreted to preclude liability for false statements. For example, defamatory statements can be made the basis for liability. 18 U.S.C. § 1001 imposes criminal penalties for knowingly and wilfully concealing or misrepresenting material facts before any department or agency of the United States. Courts uniformly punish perjury. As the Supreme Court stated in [Gertz, 418 U.S. at 340, 94 S.Ct. 2997], "there is no constitutional value in false statements of fact.” Contrary to defendants’ assertions, there is simply no basis to hold that deliberately misrepresenting facts to an administrative body for anticompetitive purposes enjoys blanket first amendment protection.
690 F.2d at 1261-62. We read Clipper Exxpress to explain, as we have done herein, that although false factual speech is not protected for its own sake such that the First Amendment precludes its prosecution, laws prohibiting it must nonetheless target well-defined subsets of speech like defamation or fraud or other clearly-defined criminal conduct.

. While it may seem unlikely anything but the most egregious violations of the Act would be prosecuted, we do not determine the constitutionality of the Act based on our assumptions of how prosecutors will, in their discretion, enforce it. See Stevens, 130 S.Ct. at 1591 ("CT]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.”).

. The “clear and present danger” rule has long been criticized as being insufficiently protective of First Amendment freedoms when it comes to seditious and some other forms of speech. See Thomas I. Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 910-12 (1963). Indeed, the holding of Schenck itself, in which the Court upheld a prosecution for discouraging military enlistment, was accompanied by a strong dissent. However, our purpose here is only to articulate minimum requirements that must be met before a false statement of fact can be removed from First Amendment protection under existing precedents. Some false statements of fact made with scienter *1215 and likely to cause a real harm might nonetheless deserve constitutional protection, such as the sort of malicious false speech targeted by the Alien and Sedition Act, see infra pp. 1213-14. In such a case, additional First Amendment scrutiny would obviously be required.

. Judge Bybee emphasizes our failure to identify any other unconstitutional applications of the Act. Of course, we cannot identify other invalid applications because Alvarez's prosecution is the first case brought under the Act in its current form. The second prosecution we know of, United States v. Strandlof, No. 09-cr-00497-REB, 2010 WL 2802691, ended in the defendant's favor, with the district court holding the Act unconstitutional for substantially the same reasons we do.