TYMKOVICH, Circuit Judge.
Appellant Rick Strandlof was charged under the Stolen Valor Act, 18 U.S.C. § 704(b), which makes it illegal to falsely claim to have received a military award or honor. We must decide whether the Act is constitutional. Answering this question requires us to determine whether, and to what extent, the First Amendment prohibits Congress from punishing knowingly false statements of fact.
Reasoning that false statements are generally protected by the First Amendment, the district court declared the Stolen Valor Act unconstitutional and dismissed the charges against Strandlof. We disagree with this reading of Supreme Court precedent and reverse. As the Supreme Court has observed time and again, false statements of fact do not enjoy constitutional protection, except to the extent necessary to protect more valuable speech. Under this principle, the Stolen Valor Act does not impinge on or chill protected speech, and therefore does not offend the First Amendment.
I.. Background

A. The Statute

The Stolen Valor Act provides:
Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.
18 U.S.C. § 704(b). The Act provides for jail terms of up to six months for most misrepresentations and up to a year for false statements that a person has received the Congressional Medal of Honor or other specified awards. Id. § 704(d).

B. Strandlofs Prosecution

Over a multi-year period, Appellant Rick Strandlof concocted a ruse that plainly put him in the cross-hairs of the Stolen Valor Act. Despite never having served in the armed forces, Strandlof founded the Colorado Veterans Alliance, and he frequently told veterans he graduated from the Unit *1152 ed States Naval Academy, was a former U.S. Marine Corps Captain, and had been wounded in combat in Iraq. He bragged of receiving a Purple Heart, which is given to soldiers wounded or killed in action, and he boasted that he had been awarded the Silver Star for gallantry in battle. For example, while attending a planning meeting for a luncheon to solicit donations for veterans, Strandlof falsely claimed to have received a Purple Heart. At veterans gatherings, Strandlof used the alias “Captain Rick Duncan,” and he created online profiles where he claimed to have graduated from the Naval Academy.
A number of local veterans found Strandlof to be an unconvincing imposter. Angered by Strandlof s lies, they contacted the FBI and reported their suspicion that “Rick Duncan” was a phony. After military officials confirmed Strandlof never attended the Naval Academy or served in the military, the government filed a criminal complaint in the District of Colorado charging Strandlof with making false claims about receipt of military decorations or medals, in violation of the Stolen Valor Act.
Strandlof pleaded not guilty and moved to dismiss the charges. Represented by a federal public defender, he argued the Stolen Valor Act is unconstitutional under the First Amendment, both facially and as applied to him, because it is a content-based restriction on speech. Rejecting the government’s argument that false speech is unprotected under the First Amendment, the district court found the Act facially unconstitutional and granted Strandlofs motion. United States v. Strandlof 746 F.Supp.2d 1183, 1185 (D.Colo.2010). The court held that false speech is protected by the First Amendment unless it falls within one of the narrow categories of speech that have been historically recognized as exceptional, such as fraud or defamation. Id. at 1186-88. The district court further held the speech criminalized by the Stolen Val- or Act was analogous neither to fraud nor defamation, and that it could not be shoehorned into any of the other historical categories. Id. The district court therefore characterized the Act as a content-based regulation of protected speech and held that it did not survive strict scrutiny. Id. at 1189-91.

C. Other Stolen Valor Act Prosecutions

Other courts have confronted this same question, with varying results.[1] In United States v. Alvarez, 617 F.3d 1198 (9th Cir. 2010), the only circuit court case to consid *1153 er this issue, a divided Ninth Circuit panel held the Stolen Valor Act is facially unconstitutional.[2] The majority opinion found that “false factual speech, as a general category unto itself,” does not fall within those “historical and traditional categories [of unprotected speech] long familiar to the bar.” Id. at 1206 (quotation omitted). Specifically, the court reasoned that the Stolen Valor Act does not “fit[] into the defamation category” of unprotected speech, because it does not prohibit only speech that is made with actual malice or knowledge of falsity and that is “injurious to a private individual.” Id. at 1209 (quotation omitted). Thus, the Ninth Circuit applied strict scrutiny and concluded that, although the Stolen Valor Act serves an important interest (perhaps even a compelling interest), it is not narrowly tailored because “other means exist to achieve the interest of stopping [false speech regarding military awards], such as by using more speech, or redrafting the Act to target actual impersonation or fraud.” Id. at 1211.
In a dissenting opinion, Judge Bybee concluded strict scrutiny was unnecessary because Supreme Court precedents established knowingly false statements of fact as a category of speech unprotected by the First Amendment. Id. at 1218-19 (Bybee, J., dissenting). In addition, several circuit judges wrote concurring or dissenting opinions to the Ninth Circuit’s subsequent, narrowly divided, order denying rehearing. The Supreme Court granted a writ of certiorari to review Alvarez.[3] United States v. Alvarez, — U.S. -, 132 S.Ct. 457, 181 L.Ed.2d 292 (2011).
District courts considering the question have reached varying conclusions. Like the Ninth Circuit and the District of Colorado, the Southern District of Iowa concluded the Stolen Valor Act is an unconstitutional content-based restriction on speech. United States v. Kepler, No. 4:11— cr-00017 (S.D.Iowa May 31, 2011) (order). Conversely, in United States v. Robbins, 759 F.Supp.2d 815 (W.D.Va.2011), the Western District of Virginia concluded false statements of fact are not constitutionally protected and upheld the Act.
Appeals involving the constitutionality of the Stolen Valor Act are pending in the Eighth and Eleventh Circuits. See United States v. Kepler, No. 11-2278 (8th Cir.2011); United States v. Amster, No. 10-12139 (11th Cir.2011).
II. Discussion
The sole question presented is whether the Stolen Valor Act, a content-based restriction on speech, is facially constitutional. We find it is and reverse the district court’s decision. As the Supreme Court has repeatedly asserted, the Constitution does not foreclose laws criminalizing knowing falsehoods, so long as the laws allow “breathing space” for core protected speech — as the Supreme Court calls it, “speech that matters.” Gertz v. Robert Welch, Inc., 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (applying New *1154 York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). As we show, under this legal framework, the Stolen Valor Act survives scrutiny because (1) it restricts only knowingly false statements of fact, and (2) specific characteristics of the statute, including its mens rea requirement, ensure it does not overreach so as to chill protected speech.
In the next section, we review the specifics of the Act, analyze what the Supreme Court has and (as importantly) has not said about legislative restrictions on false statements of fact, and survey past legislative efforts to regulate in this area.

A. Legal Background

1. The Stolen Valor Act
Since America’s founding, penalties have been imposed for wearing unauthorized military medals. General Orders of George Washington Issued at Newburgh on the Hudson, 1782-178S, at 34-35 (Edward C. Boynton ed., 1883) (reprint 1903) (“Should any who are not entitled to the [military] honors have the insolence to assume to the badges of them, they shall be severely punished.”); see also Alvarez, 617 F.3d at 1234 (Bybee, J., dissenting). And since 1949, 18 U.S.C. § 704(a) has made it illegal to wear, manufacture, or sell unauthorized military awards. In recent years, during the Afghanistan and Iraq wars, Congress judged prior laws insufficient to deter false statements regarding military decorations, see, e.g., 151 Cong. Rec. S12,688 (daily ed. Nov. 10, 2005) (statement of Sen. Conrad), and Congress responded in 2006 by passing the Stolen Valor Act, 18 U.S.C. § 704(b). In doing so, Congress found, among other things, that false statements regarding military honors effect harm by “damaging] the reputation and meaning of [] decorations and medals.” Stolen Valor Act of 2005, Pub.L. No. 109-437, § 2(1), 120 Stat. 3266 (2006). According to Congress, the legislation was necessary “to permit law enforcement officers to protect the reputation and meaning of military decorations and medals.” Id. § 2(3).
The restrictions in the Stolen Valor Act are specifically aimed at one category of speech — lies about military honors. Given this focus, the Act is a content-based restriction on speech. Under the plain terms of the Act, if someone pontificating on a street corner falsely (and with knowledge of the falsehood) proclaims to be a decorated veteran, he has committed a criminal act. It is inconsequential whether the lie induced reliance or caused discrete harm.[4]
 Despite the potential breadth of the statute, however, it has limits. The Supreme Court requires we read an act of Congress narrowly, so as to avoid constitutional problems. We “will ... not lightly assume that Congress intended to infringe constitutionally protected liberties.” Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (“[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.”). Accordingly, we find the Act is limited in two important ways.
*1155 First, the term “falsely represents,” as used in § 704(b), connotes that to be guilty, a speaker must have had a specific intent to deceive. See, e.g., Black’s Law Dictionary 1091 (9th ed.2009) (a “false representation,” also known as a “misrepresentation,” is “[t]he act of making a false or misleading statement about something, usu[ally] with the intent to deceive”); see also United States v. Perelman, 658 F.3d 1134, 1138 (9th Cir.2011) (holding the provision of the Stolen Valor Act that bars the unauthorized wearing of medals, § 704(a), should be interpreted as limited to situations where the wearer “has an intent to deceive”).[5] Therefore, we find § 704(b) contains a scienter element, which operates to criminalize only knowingly false statements about receiving military awards. This interpretation aligns with the presumption that criminal statutes contain an implied mens rea requirement. See, e.g., Staples v. United States, 511 U.S. 600, 605-06, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Thus, the Act does not punish unwitting lies about military awards.
Second, the Stolen Valor Act does not criminalize any satirical, rhetorical, theatrical, literary, ironic, or hyperbolic statements that qualify as protected speech. See, e.g., Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam) (interpreting prohibition on knowingly making “any threat” to harm the President as excluding “political hyperbole” in the absence of any evidence of contrary congressional intent). The Act’s requirement that false statements be made with an intent to deceive, as we explain below, would not allow the government to prosecute individuals for making ironic or other artistically or politically motivated statements. Black’s Law Dictionary 1415 (a “representation” is a “presentation of fact”).
We thus disagree with the suggestion that upholding the Stolen Valor Act would lead America down a slippery slope where Congress could criminalize an appallingly wide swath of ironic, dramatic, diplomatic, and otherwise polite speech. See, e.g., United States v. Alvarez, 638 F.3d 666, 684 (9th Cir.2011) (Kozinski, C.J., concurring in the denial of rehearing en banc) (cataloguing various colorful, everyday utterances that legislatures could conceivably criminalize if the Stolen Valor Act is upheld). Indeed, just because Congress can criminalize some lies does not imply it can attack opinions (e.g., “You look beautiful today”), ideologically inflected statements (e.g., holocaust denial or climate change criticism), or anything else that is not a knowingly false factual statement made with an intention to deceive.[6]
*1156 Read with these two limitations, only outright lies — not ideas, opinions, artistic statements, or unwitting misstatements of fact — are punishable under the Act. With this in mind, we consider the constitutional framework.
2. Constitutional Framework
The First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I.
Despite this plain language, little historical consensus exists as to the original public meaning of this clause, in part because the framers apparently did not envision that Congress would actively regulate speech. See Akhil Reed Amar, How America’s Constitution Affirmed Freedom of Speech Even Before the First Amendment, 38 Cap. U.L.Rev. 503, 504 (2010). It is clear, however, that, “[t]he framing-era conception of freedom of speech and the press was anything but capacious, at least by contemporary standards.” Lawrence Rosenthal, First Amendment Investigations and the Inescapable Pragmatism of the Common Law of Free Speech, 86 Ind. L.J. 1, 13 (2011); see also Frederick Schauer, Facts and the First Amendment, 57 UCLA L.Rev. 897, 904 (2010) (observing that initially, “[c]ampaigns for increased freedom of speech ... were largely about the claimed right to criticize ... the government ... but it was scarcely even suggested that freedom of speech encompassed the right to articulate factually false propositions”). Indeed, it took Congress only a few years to pass the Sedition Act of 1798, 1 Stat. 596, which made it a crime to “write, print, utter or publish ... any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress ..., or the President ..., with intent to defame ... or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States.” See also New York Times, 376 U.S. at 273-74, 84 S.Ct. 710 (describing the content and import of the Sedition Act). While the Sedition Act was never formally tested in the Supreme Court (it expired on March 3, 1801, the day before President Adams’s presidential term ended), the Act has long been recognized as unconstitutional. See, e.g. id. at 276, 84 S.Ct. 710 (“Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.”); Act of July 4, 1840, c. 45, 6 Stat. 802, accompanied by H.R.Rep. No. 86, 26th Cong., 1st Sess. (1840) (repaying fines levied in Sedition Act prosecutions on the ground that the Act was unconstitutional). And it was not until the 1920s and 1930s, in cases involving prosecutions for allegedly seditious political activity, that the Supreme Court first invoked liberty interests inherent in the Fourteenth Amendment’s due process clause to reverse criminal convictions based on speech. See, e.g., Fiske v. Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927); Stromberg v. People of State of Cal, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Amar, supra, at 504.
Over time, however, free speech doctrine has evolved to reflect a broad and principled conception of the First Amendment. “At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. ‘[T]he freedom to speak one’s mind is not only an aspect of individual liberty — and thus a good unto itself — but also is essential to the common quest for truth and the vitality of society as a whole.’ ” Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50-51, 108 S.Ct. 876, *1157 99 L.Ed.2d 41 (1988) (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 503-04, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). “[A]s a general matter, ... government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (quotation marks omitted). And in most cases, a content-based restriction on speech can withstand a First Amendment attack only if it satisfies strict scrutiny — that is, only if the challenged legislation is narrowly drawn to serve a compelling governmental interest. R.A.V. v. City of St. Paul, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).
Given this case law, the Stolen Valor Act, a content-based restriction, is “presumptively invalid, and the government bears the burden to rebut that presumption.” United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (quotation omitted). And doubly so since the Act criminalizes the speech it condemns.
But despite the First Amendment’s open-ended language, not all categories of speech receive full constitutional protection. The Supreme Court, in a long line of cases, has recognized Congress may regulate some types of speech without facing constitutional scrutiny. For example, in Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the Supreme Court upheld a law prohibiting “fighting words,” reasoning the Constitution does not afford shelter to words “which by their very utterance inflict injury or tend to incite an immediate breach of the peace.” In doing so, the Court observed, “it is well understood that the right of free speech is not absolute at all times and under all circumstances.” Id. at 571, 62 S.Ct. 766; see also Gertz, 418 U.S. at 382, 94 S.Ct. 2997 (White, J., dissenting) (the framers recognized, “in any well-governed society, the legislature has both the right and the duty to prohibit certain forms of speech” (quotation omitted)). As Justice Story, one of our most respected constitutional scholars, recognized, the First Amendment is not made of absolutes: it was never “intended to secure to every citizen an absolute right to speak, or write, or print, whatever he might please”; to think so “is a supposition too wild to be indulged by any rational man.” Joseph Story, Commentaries on the Constitution 703 (1833). Similarly, Thomas Cooley, perhaps the leading constitutional scholar of the Reconstruction Era, suggested the First Amendment protects expression only “so long as it is not harmful in its character, when tested by such standards as the law affords.” Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 421 (1868). While these conceptions of the First Amendment are quaint by today’s standards, they frame the historical context of our narrow inquiry: whether false statements of fact are entitled to blanket First Amendment protection.
3. Knowingly False Statements of Fact
Since the 1960s, the Supreme Court has repeatedly declared that knowingly false statements of fact, as a category of speech, are not generally entitled to full First Amendment protection. As the Court recently confirmed, protection of false statements is derivative of the need to ensure that false-speech restrictions do not chill valuable speech. “[W]hile false statements may be unprotected for their own sake, the First Amendment requires *1158 that we protect some falsehood in order to protect speech that matters.” BE & K Constr. Co. v. NLRB, 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (quotation omitted). Thus, so long as legislatures avoid unduly chilling speech that matters, they have room to regulate false statements of fact.
This approach to false-statements legislation traces back to three Supreme Court cases involving defamation: New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710,11 L.Ed.2d 686 (1964); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); and Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). These cases and the cases that follow teach us that false statements of fact are generally unprotected— but with a caveat. The Court has recognized that false-speech restrictions may violate the First Amendment when they are so suffocating as to afford inadequate breathing space for constitutionally valuable speech.
In fleshing out this doctrine, we start with the celebrated case of New York Times Co. v. Sullivan, 376 U.S. at 280-84, 84 S.Ct. 710. There, the Supreme Court set forth a framework for applying the First Amendment to states’ abilities to punish defamatory falsehoods. In striking down an aspect of Alabama’s defamation law, the Court held the First Amendment (and Fourteenth Amendment)[7] permits state legislatures to impose liability for making a defamatory statement regarding a public official only if the “public official ... proves that the statement was made with ‘actual malice’ — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.” Id. at 279-80, 84 S.Ct. 710. This holding was based on the Court’s reasoning that because “erroneous statement is inevitable in free debate, ... it must be protected if the freedoms of expression are to have the ‘breathing space ’ that they need ... to survive.” Id. at 271-72, 84 S.Ct. 710 (quotations and alterations omitted) (emphasis added). The Court recognized the danger that a strict liability or negligence standard could chill constitutionally protected speech by silencing speakers seeking to avoid malicious prosecution or jury misunderstanding. Protecting some false utterances — those made without malice or on matters of private concern — was the only way to avoid deterring a range of truthful statements that benefit public discourse. Implicit in the Court’s analysis, however, was the understanding that false statements, standing alone, lack elemental constitutional value, and public discourse is not diminished when a speaker is deterred from making a false statement of fact.
Just a few months after New York Times, the Supreme Court applied these principles in Garrison v. Louisiana. In that case, the Court recognized expressly that knowingly false statements are not entitled to full First Amendment protection:
Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is used as a tool for political ends does not automatically *1159 bring it under the protective mantle of the Constitution.
The Court went on to proclaim:
For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.
Garrison, 379 U.S. at 75, 85 S.Ct. 209 (emphasis added) (citation, quotation marks, and alterations omitted).
Ten years later, in Gertz v. Robert Welch, the Supreme Court reiterated, in perhaps even plainer terms, that false statements of fact receive limited shelter from the First Amendment:
Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society’s interest in uninhibited, robust, and wide-open debate on public issues. They belong to that category of utterances which ‘are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.’ [Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766.] ... [T]he erroneous statement of fact is not worthy of constitutional protection.
418 U.S. at 339-40, 94 S.Ct. 2997 (citation and quotation marks omitted) (emphasis added). In line with the breathing space principle enunciated in New York Times, the Court recognized false statements of fact are “inevitable in free debate ... [a]nd punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.” Id. at 340, 94 S.Ct. 2997. Therefore, the Court explained, “[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters.” Id. at 341, 94 S.Ct. 2997. And the Court also noted that, if a law provides breathing space but chills some speech, the law is constitutional only if it “reach[es] no farther than is necessary to protect the legitimate interest involved.” Id. at 349, 94 S.Ct. 2997.
Thus, the Supreme Court has expressly stated that, although laws punishing false statements must afford adequate breathing space to protected speech, knowingly false factual statements are not intrinsically protected under the First Amendment. The theoretical basis for this classification is based on the understanding that “[fjalse statements of fact are particularly valueless [because] they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual’s reputation that cannot easily be repaired by counter-speech, however persuasive or effective.” Hustler Magazine, 485 U.S. at 52, 108 S.Ct. 876. In other words, knowingly false statements, in contrast even to incendiary ideas, are no part of the “the common quest for truth and the vitality of society as a whole.” Id. at 51,108 S.Ct. 876. Just because controversial ideas and opinions merit constitutional protection does not *1160 mean false facts deserve the same immunity-
In summary, New York Times, Garrison, and Gertz require a three-part inquiry. First, we must assess whether a law punishes only knowingly false statements. If this is the case, the court must then decide whether the law leaves adequate “breathing space” for truthful and other fully protected speech. And if a statute survives both of these inquiries but still chills some speech, it is constitutional so long as it reaches no further than necessary to protect the government’s legitimate interest.
The breathing space approach set forth in these cases remains good law and is binding on us. Further, New York Times, Garrison, and Gertz are not anomalous constitutional outliers. In fact, consistently over the past five decades — in cases involving defamation, libel, commercial speech, intentional infliction of emotional distress, and other legislative areas — the Court has reiterated that false statements of fact receive minimal constitutional protection. See, e.g., BE & K Constr. Co., 536 U.S. at 530-31, 122 S.Ct. 2390 (“[F]alse statements are not immunized by the First Amendment right to freedom of speech....” (quotation omitted)); Hustler Magazine, 485 U.S. at 52, 108 S.Ct. 876 (“False statements of fact are particularly valueless----”); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (“False statements of fact harm both the subject of the falsehood and the readers of the statement.... There is no constitutional value in false statements of fact.” (quotation omitted)); Bill Johnson’s Rests., Inc. v. NLRB, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (“[F]alse statements are not immunized by the First Amendment right to freedom of speech.... ”); Brown v. Hartlage, 456 U.S. 45, 60-61, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) (false factual statements “are not protected by the First Amendment in the same manner as truthful statements” (citation omitted)); Herbert v. Lando, 441 U.S. 153, 171, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (“Spreading false information in and of itself carries no First Amendment credentials. ‘[T]here is no constitutional value in false statements of fact.’ ” (quoting Gertz, 418 U.S. at 340, 94 S.Ct. 2997)); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (“Untruthful speech ... has never been protected for its own sake.”); Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 499 n. 3, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (Powell, J., concurring) (“[T]he common premise [is] that while the Constitution requires that false ideas be corrected only by the competitive impact of other ideas, the First Amendment affords no constitutional protection for false statements of fact.”); Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (“[Constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function.”).
Most circuit courts have recognized these authorities and held that false statements of fact receive limited First Amendment protection. See, e.g., Gibson v. May- or & Council of Wilmington, 355 F.3d 215, 228 (3d Cir.2004) (“[L]ies and untruthful statements are protected under First Amendment jurisprudence only in those rare instances where they contribute to the uninhibited marketplace of ideas.” (quotation omitted)); Colson v. Grohman, 174 F.3d 498, 507 (5th Cir.1999) (“[Intentional or reckless falsehood, even political falsehood, enjoys no First Amendment protection.”); Pestrak v. Ohio Elections Comm’n, 926 F.2d 573, 577 (6th Cir.1991) (“[F]alse speech, even political speech, *1161 does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth.”); Solano v. Playgirl, Inc., 292 F.3d 1078, 1089 (9th Cir.2002) (“The First Amendment does not protect knowingly false speech.”); Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1261 (9th Cir.1982), overruled on other grounds by Mayle v. Felix, 545 U.S. 644, 657-59, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (“The first amendment has not been interpreted to preclude liability for false statements.”); Bennett v. Hendrix, 325 Fed.Appx. 727, 742 (11th Cir.2009) (“[SJpeech constituting] a false factual assertion [ ] is not protected by the First Amendment.”); United States v. Capps, 140 Fed.Appx. 911, 913 (11th Cir.2005) (“Capps had no First Amendment right to make a false statement.”).
And most importantly, these principles extend well beyond the narrow context of defamation. Since New York Times, Garrison, and Gertz, courts have extended the “false statements of fact” exception to cover many categories of false-speech statutes, including laws punishing fraud, false-light invasion of privacy, intentional infliction of emotional distress through false statements, trade libel, perjury, unsworn false statements of fact made to governmental officials, impersonation of a governmental official, false claims regarding university degrees and professional licenses, falsehoods in connection with political campaigns, falsehoods likely to provoke public panic, and falsehoods that are likely to lead to physical harm. See Brief for Eugene Volokh & James Weinstein Amici Curiae Supporting Petitioner at 3-11, United States v. Alvarez, No. 11-210 (U.S.
Dec. 7, 2011); Brief for Eugene Volokh Amicus Curiae Supporting Plaintiff at 1, United States v. Strandlof, No. 09-cr-00497 (D.Colo. Jan. 15, 2010).
Simultaneously, the breathing space standard of scrutiny first applied in New York Times has become the default approach in First Amendment challenges to laws regulating all categories of false statements of fact. A restriction on knowingly false factual statements is constitutional so long as it has some limiting characteristic that prevents it from suppressing constitutionally valuable opinions and true statements. The Supreme Court has applied this principle, either expressly or implicitly, in at least- the following six contexts:[8]
• Defamatory Falsehoods. For defamation actions involving public officials, liability is appropriate only if the plaintiff proves, by clear and convincing evidence, that false statements were made with knowledge or reckless disregard of their falsity, New York Times, 376 U.S. at 279-80, 84 S.Ct. 710. Non-public individuals, however, need only show the defamatory statements were made negligently. Gertz, 418 U.S. at 344, 94 S.Ct. 2997.
• Fraud. For fraud actions, liability is appropriate only if there are limiting elements such as scienter, materiality, and reliance. Illinois ex rel. Madigan v. Telemarketing Assocs., 538 U.S. 600, 620 [123 S.Ct. 1829, 155 L.Ed.2d 793] (2003).
• False-Light Torts. For false-light tort actions, liability is appropriate only when someone knowingly makes false statements, reasonably understood as statements of fact, that inflict emotional distress, without defaming or invading *1162 privacy. Time, Inc., 385 U.S. at 385-91, 87 S.Ct. 534. False-light torts cover even nondefamatory but offensive knowingly false statements about another person. See Cantrell v. Forest City Publ’g Co., 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974).
• Perjury. For perjury or fraudulent administrative filings, liability is appropriate only if the government shows the misrepresentation was willful, material, and uttered under circumstances in which the misrepresentation is designed to cause injury to the government or private interests. United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); see also Konigsberg v. State Bar of Cal, 366 U.S. 36, 49 n. 10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).
• Baseless Litigation. In a suit seeking damages as a result of baseless litigation, liability is appropriate only if the litigation is “both objectively baseless and subjectively motivated by an unlawful purpose.” BE & K Constr. Co., 536 U.S. at 531,122 S.Ct. 2390 (quoting Bill Johnson’s Rest., 461 U.S. at 743, 103 S.Ct. 2161) (quotation marks and citation omitted).
• Intentional Infliction of Emotional Distress. In a suit by a public figure seeking to recover for intentional infliction of emotional distress, liability is appropriate only if there is a showing of actual malice. Hustler, 485 U.S. at 53, 56, 108 S.Ct. 876.
Although the Supreme Court has never precisely delineated how much breathing space is necessary, these examples and associated cases reflect the Court’s consistent application of principles from New York Times — the same principles we must apply here.
No recent, directly applicable Supreme Court case calls into question the long-established breathing space approach. And, moreover, the Supreme Court has never suggested that breathing space analysis is appropriate only for historically unprotected categories of false speech. To the contrary, the breathing space inquiry applies whenever government regulates false speech. So regardless of whether the Stolen Valor Act has identifiable historical precedents, its survival turns only on whether it satisfies breathing space principles.
This conclusion is illustrated perhaps most succinctly by Time, Inc. v. Hill, 385 U.S. at 388-90, 87 S.Ct. 534, where the Supreme Court applied breathing space analysis to address a New York law giving public figures the right to sue for damages when false factual statements invaded their privacy by placing them in a false light. The Court adopted this approach despite expressly recognizing that, unlike defamation, the false-light tort did not arise out of a long historical tradition. Id. at 380-81 & n. 3, 87 S.Ct. 534. To ensure adequate breathing space for protected speech, the Court held that to recover under a false-light theory, a plaintiff must prove a false statement was made knowingly or recklessly. Id. at 389-90, 87 S.Ct. 534.
The parties here disagree on the effect of the Supreme Court’s two most recent First Amendment pronouncements — United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010), and Brown v. Entertainment Merchants Association, — U.S.-, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) — on the Court’s longstanding approach to false-statement legislation. Strandlof argues these cases fundamentally disrupt the Court’s prior approach — implicitly overruling a substantial body of Supreme Court case law.
A precise analysis of what Stevens and Brown say — and critically, what they do *1163 not say — reveals the flaw in Strandlofs argument. In Stevens and Brown, the Supreme Court addressed the constitutionality of legislation restricting films portraying animal cruelty and violent video games, respectively. In both cases, the Court recognized the existence of certain “well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.” Stevens, 130 S.Ct. at 1584 (citations and quotation omitted); Brown, 131 S.Ct. at 2734 (same); see also Chaplinsky, 315 U.S at 572, 62 S.Ct. 766 (noting the existence of unprotected categories of speech).
In Brown, the Court explained that these categories of unprotected speech are inflexible and preordained by our nation’s history. “[Without persuasive evidence that a novel restriction on content is part of a long ... tradition of proscription, a legislature may not revise the judgment [of] the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs.” Brown, 131 S.Ct. at 2734. The Court cautioned lawmakers to think twice before crafting new, as-of-yet-unrecognized categories of unprotected speech — and it expressly foreclosed the adoption of a balancing test to determine whether speech is valuable enough to merit constitutional protection. “[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated.” Id. Accordingly, “[t]he First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits.” Stevens, 130 S.Ct. at 1585.
In line with these principles, the Court has listed examples of unprotected classes of speech — including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct — but the Court has never voiced an intention to craft a comprehensive and inflexible list of unshielded utterances. See Stevens, 130 S.Ct. at 1584. To the contrary, the Court has recognized that “[m]aybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law.”[9] Id. at 1586. Based on this reasoning, in Brown the Court roundly rejected the government’s efforts to craft a category of unprotected speech protecting minors from violent images through video games.
Importantly, the breathing space analysis explained above is not an “ad hoc balancing of interests” of the sort foreclosed by Stevens, 130 S.Ct. at 1585. Rather, breathing space analysis recognizes that false statements of fact are categorically unprotected for their own sake, and then asks courts to consider whether the challenged legislation impinges on or chills core speech. While this approach gives courts some discretion in deciding how much breathing space suffices, the approach is not a balancing test in any ordinary sense. Instead, this analysis is more aptly characterized as a specific method of review the Court uses to assess laws regulating false factual statements. Breathing space review is no more of a balancing test than strict scrutiny, intermediate scrutiny, or rational basis review.
*1164 Moreover, perhaps the most important aspect of Stevens and Broum for this case is what the Court did not say. Indeed, with Stevens and Brown, the Supreme Court did not (at least for now) purport to create a unified theory of the First Amendment that would preempt all prior approaches and substitute a new doctrine. While perhaps the Court did just this (and if it did, it can tell us in Alvarez), we are quite confident the Court, if it sought such a bold result, would have expressly overruled prior doctrines. Instead, what the Court did was put in place a framework for assessing “novel restrictions” and “new categories of unprotected speech,” Brown, 131 S.Ct. at 2734 (emphasis added). But in neither Stevens nor Brown did the Court indicate an intention to disturb or reverse longstanding free speech jurisprudence for unprotected categories it has already addressed in other ways.[10]
As we read the cases, one such unprotected category is knowingly false statements of fact — a category the Supreme Court has considered time and again for the past 50 years. Under this understanding, the standard of review is straightforward: so long as the legislature leaves breathing space for valuable speech, it may restrict knowingly false statements of fact.
Accordingly, our inquiry is not whether the Stolen Valor Act is narrowly tailored to serve a compelling governmental interest. This is the lesson of New York Times, Garrison, Gertz, and the numerous cases that followed — none of which has been overturned or questioned. The Court’s false-statements precedents remain good law, and the Court in Stevens and Brown did not purport to reverse New York Times, Garrison, Gertz, and their heirs sub silentio. As the dissenting opinion in Alvarez stated, “We do not have the authority as a lower court to limit the Court’s statements to what we believe they mean rather than what they actually say.” 617 F.3d at 1223 (Bybee, J., dissenting).
The dissent conceptualizes the case law as applying only to “injurious falsehoods.” Dissent, passim. This analysis has much to commend itself. But the Supreme Court has yet to announce such a category, and as we read the cases to date its cases express a different principle. Even the dissent recognizes that the “injury” element does not flow naturally from the case law, requiring it to extract a broad notion of “direct” and “indirect” injury to persons and governmental processes to protect traditional areas regulated by statute or tort law. Dissent at 1189. Even so, this categorization calls into question many laws we *1165 describe above which require little or no injury to a third person or the government. Perhaps the Supreme Court will adopt an analysis requiring public injury and falsehood — but as we read the cases, it has yet to do so.
In sum, we understand current Supreme Court precedent to hold that although the First Amendment protects ideas, beliefs, and some erroneous statements of fact, the same level of protection does not generally extend to knowingly false statements of fact. Therefore, a restriction on knowingly false factual statements is constitutional so long as it has some limiting characteristic that prevents it from suppressing constitutionally valuable opinions and true statements.
4. Other Regulations of False Speech
The constitutional doctrine thus admits to some regulation of false speech, and many examples, from both the federal government and the states, confirm this understanding. Contrary to Strandlof s contentions, the Stolen Valor Act does not stand alone. Congress has not been reluctant to enact, and the Supreme Court has not hesitated to uphold, a number of broadly applicable measures regulating, and occasionally criminalizing, false statements of fact.
Perhaps the most familiar of these statutes is 18 U.S.C. § 1001(a), which prohibits “knowingly and willfully” making any “materially false, fictitious, or fraudulent statement or representation” in “any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.”[11] Although § 1001 initially prohibited only false statements that were intended to defraud, in 1934 Congress amended the provision to remove the deceptive-intent requirement. See United States v. Yermian, 468 U.S. 63, 70-71, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984). Not only can one be prosecuted without intentionally lying, convictions under the statute also do not require any showing of actual pecuniary or property loss to the government. United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598 (1941) (the government need only show that “perversion [] might result from [ ] deceptive practices .... ” (emphasis added)). The Supreme Court has considered § 1001 in numerous cases but has never suggested it runs afoul of the First Amendment, at least facially. See, e.g., United States v. Rodgers, 466 U.S. 475, 480, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984); Brogan v. United States, 522 U.S. 398, 400-06, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998).
Section 1001 is not a lone example. To the contrary, there are at least 100 other federal criminal statutes that penalize making false statements — none of which has been invalidated under the First Amendment. See United States v. Wells, 519 U.S. 482, 505, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (Stevens, J., dissenting) (“[A]t least 100 federal false statement statutes may be found in the United States Code. About 42 of them contain an express materiality requirement; approximately 54 do not.”). For example, it is a crime to falsely and willfully claim to be a citizen of the United States, 18 U.S.C. § 911, and it is a crime to make a knowingly false statement for the purpose of establishing eligibility to vote, 42 U.S.C. § 1973i(c). Likewise, various perjury statutes criminalize false statements made under oath, even if the perjurer has no intent to mislead, and even if there is no harm to the tribunal or inquiry. See 18 U.S.C. § 1623; 18 U.S.C. *1166 § 1621; Brogan, 522 U.S. at 402 & n. 1, 118 S.Ct. 805. As with § 1001, the Court has never suggested these provisions are unconstitutional.
Similar criminal statutes abound. See, e.g., 18 U.S.C. §§ 922(a)(6), 924(a)(1)(A) (knowingly false statements in connection with purchasing and owning firearms); 22 U.S.C. § 2778(c) (willfully untrue statements on report involving export and import of arms); 18 U.S.C. § 1015 (knowingly false statements related to citizenship and naturalization); 18 U.S.C. § 1027 (knowingly false statements in records required by ERISA); 20 U.S.C. § 1097(b) (knowingly false statements in connection with assignment of federally insured student loan); 42 U.S.C. § 405(e)(2)(C)® (willful and deceitful use of a false social security number); see also Wells, 519 U.S. at 505 n. 9, 117 S.Ct. 921 (cataloguing statutes); United States v. Gaudin, 28 F.3d 943, 959 n. 3 (9th Cir.1994) (Kozinski, J., dissenting) (cataloguing statutes).
Additionally, in a related area of law relevant to Strandlof s challenge, Congress has made it a crime to falsely purport to speak on behalf of the government. For example, it is illegal to falsely claim to be a federal officer, 18 U.S.C. § 912, or to convey a false impression of governmental endorsement in association with the Social Security Administration, 42 U.S.C. § 1320b-10(a). The goal of these provisions is to prevent con artists from misappropriating and diluting the government’s message. See United States v. Lepowitch, 318 U.S. 702, 704, 63 S.Ct. 914, 87 L.Ed. 1091 (1943) (“actual financial or property loss” are not elements of § 912 because Congress enacted the statute to “maintain the general good repute and dignity” of government service). The Stolen Valor Act accomplishes a similar goal.
States have passed analogous measures. For example, multiple state courts have upheld laws barring individuals from falsely claiming to have a particular university degree or professional license. Long v. State, 622 So.2d 536 (Fla.Dist.Ct.App.1993) (upholding statute barring knowingly false claims of having a university degree); People v. Kirk, 62 Misc.2d 1078, 310 N.Y.S.2d 155 (Cnty Ct.1969) (same); State v. Marino, 23 Kan.App.2d 106, 929 P.2d 173 (1996) (upholding statute barring knowingly false claims of having a professional license). Other states have upheld laws banning candidates for office from making knowingly false statements in the context of political campaigns. See, e.g., Treasurer of the Comm, to Elect Gerald D. Lostracco v. Fox, 150 Mich.App. 617, 389 N.W.2d 446 (1986) (upholding a statute banning false claims that one is an incumbent); State v. Davis, 27 Ohio App.3d 65, 499 N.E.2d 1255 (1985) (affirming criminal conviction for knowingly making false statements of fact in a political campaign); Ohio Democratic Party v. Ohio Elections Comm’n, No. 07AP-876, 2008 WL 3878364 (Ohio Ct.App. Aug. 21, 2008) (upholding a statute prohibiting candidates from claiming to hold an office they do not currently hold). Examples of false-statement laws enacted by state legislatures are too numerous to list, but it suffices to say these laws cover widely divergent categories of false factual speech.[12] See, e.g., Alaska Stat. § 11.56.800(a)(2) (punishing “false reportes] to a peace officer that a crime has occurred or is about to occur”); Ariz.Rev. Stat. § 13-2907.03 (punishing a knowingly “false report of sexual assault involving a *1167 spouse”); Conn. Gen.Stat. § 53-378(b) (prohibiting lies about receiving military awards); Kan. Stat. Ann. § 21-6410 (punishing falsely claiming to be a member of a veterans’ organization); Nev.Rev.Stat. § 199.145 (punishing any willful “unqualified statement of that which the person does not know to be true” made under oath); Rev.Code Wash. § 9A.60.070 (punishing knowingly false claims of “a credential issued by an institution of higher education that is accredited,” in promotion of a business or with the intent to obtain employment); see also Alvarez, 638 F.3d at 684 (O’Scannlain, J., dissenting from denial of rehearing en banc) (cataloguing federal and state false-statements laws); Larry D. Eldridge, Before Zenger: Truth and Seditious Speech in Colonial America, 1607-1700, 19 Am. J. Legal Hist. 337, 352-53 (1995) (citing examples of Colonial-era statutes regulating false speech).
Finally, we note there are numerous examples of state-law convictions for various forms of impersonation and misappropriation of governmental speech. See, e.g., State v. Messer, 278 Kan. 161, 91 P.3d 1191 (2004) (upholding conviction under Kansas false impersonation statute when defendant falsely claimed to be an undercover police officer, apparently with no attempt to use the pretense to obtain money or property); State v. Wickstrom, 118 Wis.2d 339, 348 N.W.2d 183 (Wis.Ct.App.1984) (upholding a state ban on falsely acting as a police officer); State v. Cantor, 221 N.J.Super. 219, 534 A.2d 83 (N.J.Super.Ct.App.Div.1987) (upholding conviction of defendant who impersonated a county morgue employee).
With this legal framework and historical background, we turn to the constitutionality of the Stolen Valor Act.

B. Constitutionality of the Stolen Valor Act

Under the Supreme Court’s precedents, the Stolen Valor Act is facially constitutional. The Act prohibits only knowingly false statements of fact, it provides breathing space for valuable speech, and it “reach[es] no farther than is necessary to protect the legitimate interest involved.” Gertz, 418 U.S. at 349, 94 S.Ct. 2997. There is almost no danger anyone would suppress their speech to avoid punishment under the Act.
Most importantly, under the Act, no one may be punished unless it is proven that he knowingly made a false statement of fact, and the government must establish any disputed facts beyond a reasonable doubt. This scienter requirement provides “an extremely powerful antidote to the inducement to [] self-censorship.” Id. at 342, 94 S.Ct. 2997. And tellingly, the Supreme Court has never invalidated a false-statement restriction that contains a knowledge requirement.
Further, not just any false statement is punishable under the Stolen Valor Act. Utterances criminalized by the Act are objective and verifiable, and they are particularly valueless under First Amendment principles. Although military affairs are undoubtedly matters of public importance, lying about receiving military medals does nothing to contribute to any conceivable public debate. The Stolen Valor Act simply does not punish political speech, factually correct statements, artistic expressions, or opinions of any sort.[13] *1168 No one is inhibited from criticizing the armed forces, opining about military actions and administration, stating political opinions, or reporting on governmental affairs. And nothing about the Stolen Valor Act impinges upon our “profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open.” New York Times, 376 U.S. at 270, 84 S.Ct. 710. By prohibiting only specific, knowingly false assertions of fact that do not bear on political speech or matters of public debate, the Act promotes the “large[] public interest, secured by the Constitution, in the dissemination of truth.” Garrison, 379 U.S. at 73, 85 S.Ct. 209.
In this same vein, the Stolen Valor Act’s content-based restriction is permissible because “there is no realistic possibility that official suppression of ideas is afoot.” R.A.V., 505 U.S. at 390, 112 S.Ct. 2538, see also id. at 387, 391, 112 S.Ct. 2538 (“[C]ontent discrimination,” even within a class of “proscribable speech,” is presumptively unconstitutional because it may “impose special prohibitions on those speakers who express views on disfavored subjects.”). False claims violating the Act do not advance a particular viewpoint or a specific topic of debate. A person is extraordinarily unlikely to mistakenly claim to have been awarded a military medal, and the accuracy of statements regarding military awards is objectively verifiable. Cf. Virginia State Bd. of Pharmacy, 425 U.S. at 771 n. 24, 96 S.Ct. 1817 (false statements in commercial advertising are more easily punishable than other false statements because “[t]he truth of commercial speech ... may be more easily verifiable by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else”). Indeed, there is scant risk the Stolen Valor Act would cause someone to refrain from truthful speech about military awards out of “doubt whether [truth or lack of knowledge] can be proved in court or fear of the expense of having to do so.” New York Times, 376 U.S. at 279, 84 S.Ct. 710.
This contrasts the false speech at issue here with libel or defamation actions, where it is often challenging to determine whether factual allegations are in fact untruthful. “Even courts accepting th[e] defense [of truthfulness] as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.” Id. Determining whether someone has violated the Stolen Valor Act is simple and, in nearly any conceivable case, not subject to error. Therefore, the government cannot use the Stolen Valor Act to suppress undesirable political opinions.
For these reasons, the Stolen Valor Act simply does not encroach on any protected speech. It punishes only false statements that are made knowingly and are objectively verifiable; there is no risk of stifling opinions or true statements; the Act does not advocate any particular viewpoint or take a stance on any dogma or scientific issue; there is no danger that a political majority could use the law to censor legitimate speech; and there is no threat of suppressing ideas or opinions. In short, breathing space is plentiful. There is no danger that anyone would suppress their speech to avoid prosecution under the Stolen Valor Act.
Finally, even were we to assume the Stolen Valor Act chills some speech, it “reach[es] no farther than is necessary to protect the legitimate interest involved.” Gertz, 418 U.S. at 349, 94 S.Ct. 2997. As an initial matter, the government has an *1169 important — perhaps compelling — interest in preventing individuals from falsely claiming to have received military awards.[14] As we described, the government’s tradition of awarding military honors in recognition of valorous acts in service dates back to the Revolutionary War. Ever since, the United States has maintained a strictly regulated system of military awards to commend heroism, foster pride in service, and motivate service members to higher achievement. See, e.g., Examination of Criteria for Awards and Decorations: Hearing before the Sub-comm. on Military Personnel of the H. Comm, on Armed Services, 109th Cong., 2d Sess. 24 (2006) (statement of Lt. Gen. Roger A. Brady) (stating that, by “recognizing acts of valor, heroism, and exceptional duty and achievement,” military medals serve the important purpose of “foster[ing] morale, mission accomplishment and esprit de corps ” among service members); id. at 26 (statement of Brig. Gen. Richard P. Mills) (highlighting the “importance of a viable and robust military combat awards system in maintaining morale, esprit de corps, and pride in [one’s] fellow Marines”). Military medals confer prestige on recipients and express the country’s gratitude for heroic acts and service. Given this, it follows Congress could conclude that falsely proclaiming to be a decorated veteran diminishes the value of military awards, misappropriates the government’s speech, and interferes with the military’s ability to make statements regarding the valor of its soldiers. Cf. San Francisco Arts & Athletics Inc. v. U.S. Olympic Comm., 483 U.S. 522, 532 n. 8, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (recognizing the government’s interest in preventing misappropriation of the term “Olympics,” and analogizing that prohibition to 18 U.S.C. § 705, which prohibits the unauthorized use of the insignia of veterans’ organizations).
Further, the Stolen Valor Act is closely tied to the strong governmental interest in protecting the value of military honors. As already explained, the Act chills very little, if any, protected speech. Moreover, the Act is but the latest, incremental step among many Congress has taken to protect the integrity and effectiveness of the military honors system. In addition to a longstanding and well-developed set of guidelines governing military awards, see generally Dept, of Defense, Manual of Military Decorations and Awards (2010), the government has installed numerous specific measures to safeguard the prestige of military honors. Among many others, these include: prohibiting the award of the highest honors to those whose subsequent conduct has not been honorable; revoking medals if later-discovered facts would have foreclosed the award of the medal; publishing the names of Medal of Honor recipients; taking steps to protect the intellectual property associated with medal designs, so as to prevent imitations; establishing a committee to review previous Medal of Honor recipients and rescind those who did not meet standards codified into law; and, with § 704(a), prohibiting wearing, manufacturing, or selling a military medal without authorization. Congress passed the Stolen Valor Act after determining that preexisting steps were insufficient to prevent false claims. Given how little risk there is that the Act would *1170 chill protected speech, we cannot say the measure is too expansive.
The Stolen Valor act survives breathing space review and is constitutional.
III. Conclusion
For the foregoing reasons, we REVERSE the district court’s dismissal and REMAND for proceedings consistent with this opinion.

. The broader question of the constitutionality of knowing falsehoods has also inspired significant scholarly debate, with no clear consensus. See, e.g., Frederick Schauer, Facts and the First Amendment, 57 UCLA L.Rev. 897 (2010); Steven G. Gey, The First Amendment and the Dissemination of Socially Worthless Untruths, 36 Fla. St. U.L.Rev. 1 (2008); Jonathan D. Varat, Deception and the First Amendment, A Central, Complex, and Somewhat Curious Relationship, 53 UCLA L.Rev. 1107 (2006); James Weinstein, Speech Categorization and the Limits of First Amendment Formalism: Lessons from Nike v. Kasky, 54 Case W.L.Rev. 1091 (2004); Kenneth Lasson, Holocaust Denial and the First Amendment: The Quest for Truth in a Free Society, 6 Geo. Mason L.Rev. 35 (1997); Charles Fried, The New First Amendment Jurisprudence: A Threat to Liberty, 52 U. Chi. L.Rev. 225 (1992); Mark Tushnet, ‘Telling Me Lies’: The Constitutionality of Regulating False Statements of Fact, Harv. Pub.L. Working Paper No. 11-02 (2011), available at http://papers.ssrn.com/sol 3/papers.cfm?abstract_id= 1737930; Josh M. Parker, The Stolen Valor Act as Constitutional: Bringing Coherence to First Amendment Analysis of False Speech Restrictions, 78 U. Chi. L.Rev. — (Forthcoming 2011); Jeffrey C. Barnum, False Valor: Amending the Stolen Valor Act to Conform with the First Amendment’s Fraudulent Speech Exception, 86 Wash. L.Rev. 841 (2011).

. In addition, the Eighth Circuit recently considered an analogous question — the constitutionality of a state statute prohibiting false statements about ballot initiatives — and held knowingly false campaign speech is not a category of unprotected speech. 281 Care Comm. v. Ameson, 638 F.3d 621 (8th Cir. 2011).

. The government suggested we stay this case while the Supreme Court reviews Alvarez. Strandlof urged us to decide the case. Our practice as a court has been to decide cases that are ripe even while parallel cases are under review by the Supreme Court. See, e.g., United States v. Story, 635 F.3d 1241 (10th Cir.2011); In re Dawes, 652 F.3d 1236 (10th Cir.2011); United States v. West, 550 F.3d 952 (10th Cir.2008).

. In May 2011, Representative Joseph Heck introduced a congressional resolution, which amends the Stolen Valor Act to add a requirement that, to violate the act, misrepresentations must be made "with intent to obtain anything of value." H.R. 1775, 112th Cong. (2011). This resolution, which would expressly transform the Act into a fraud statute, was referred to subcommittee in June 2011.

. The dissent finds an intent to deceive requirement at odds with the statute. But such a requirement follows naturally from the text’s emphasis on false representations, of which intent to deceive is naturally a part. The Stolen Valor Act does not compel the expansive reading the dissent provides. Rather, the Act is aimed at the “deceptive use of military medals,” i.e., that "deception was the targeted harm.” Perelman, 658 F.3d at 1137 (emphasis in original).

. And of course, the judiciary will continue to scrutinize arbitrary and irrational legislative enactments. Moreover, we expect that, just as they have for centuries, legislative majorities will continue to exercise judgment — constitutional as well as practical — and refrain from enacting outrageous laws that encroach upon the ability of individuals to voice their opinions, converse with fellow citizens, and go about their lives. If a legislature were to attempt to ban innocuous “white lies,” we would likely have already traveled far down a path of tyranny in other, more significant, areas.

. Earlier Supreme Court cases upheld libel statutes under the Fourteenth Amendment. See, e.g., Beauhamais v. People, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

. For a thorough discussion of the following categories, see Brief for the United States, United States v. Alvarez, No. 11-210, at 21-28 (U.S. Dec. 1, 2011), and Brief for Eugene Volokh & James Weinstein, Amici Curiae Supporting Petitioner at 3-11, United States v. Alvarez, No. 11-210 (U.S. Dec. 7, 2011).

. In the cases since Chaplinsky, the Supreme Court has held that the historical categories include certain types of speech, including profanity, libel, fighting words, fraud, and incitement. The cases are not consistent, however, in listing the same categories — and regardless, the word “includes” typically is a term of enlargement, not of limitation. Burgess v. United States, 553 U.S. 124, 131 n. 3, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008).

. In addition, although the Supreme Court has identified some examples of historically unprotected categories of speech, it has offered very little guidance regarding the level of generality with which we should define these categories. So in coming up with a list of unprotected categories of speech, a court may be faced with intractable questions. Are the categories of defamation, fraud, perjury, and false light discrete and limited? Or are they merely examples of the sorts of speech encompassed in the overarching category of knowingly false statements of fact? The problem here is that the only criterion identified by the Supreme Court — history—is of no help in determining the level of generality at which the unprotected categories should be described.
The best guidance we find on this question comes from an entirely different context. In Michael H. v. Gerald D., 491 U.S. 110, 127 n. 6, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), the Supreme Court suggested that, in determining the level of generality at which traditional protections of family autonomy should be described, “We refer to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified.” See Tushnet, supra, at 15-17 (discussing the difficulties in identifying the level of generality with which to describe unprotected categories of speech).

. For a discussion of § 1001 and other statutory examples, see Brief for the United States, United. States v. Alvarez, No. 11-210, at 29-33 (U.S. Dec. 1, 2011).

. In addition to those listed here, amici in Alvarez have provided an extensive list of representative false-statements provisions enacted by state legislatures. See Brief for 20 States as Amici Curiae Supporting Petitioner at 2-4 & n.l, United States v. Alvarez, No. 11-210, at 26-27 (U.S. Dec. 8, 2011)

. Further, if an exceptional false statement about one’s military honors did constitute a form of protected speech (e.g., political speech), the Stolen Valor Act could be challenged on an as-applied basis even though we find the Act facially constitutional.

. We need not decide, however, whether the Stolen Valor Act is narrowly tailored to serve a compelling governmental interest. Some courts and judges have reached this conclusion, and a majority hold that the Act is insufficiently narrow to survive strict scrutiny. See, e.g., Alvarez, 617 F.3d at 1217 (‘‘[H]onoring and motivating our troops are doubtless important governmental interests, but we fail to see how the Act is necessary to achieving either aim.”).